## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CYRUS ONE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18 C 272 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| THE CITY OF AURORA, ILLINOIS and | ) | |
| SCIENTEL SOLUTIONS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are plaintiff's motion for preliminary injunction [67], plaintiff's motion to exclude defendant Scientel Solutions LLC's Expert Scott Snopek [124], and plaintiff's motion to exclude defendant Scientel Solutions LLC's Expert Michael Cataletto [127]. For the reasons set forth below, plaintiff's motions to exclude are denied as moot, and plaintiff's motion for preliminary injunction is denied.

## BACKGROUND

Plaintiff CyrusOne LLC ("CyrusOne") operates a data center in Aurora, Illinois. The data center hosts the trading infrastructure for the Chicago Mercantile Exchange ("CME"). CyrusOne has constructed a 350-foot telecommunications tower (the "CyrusOne tower") that aims to serve wireless networks and telecommunication links requiring connection to the data center and the CME. Defendant City of Aurora (the "City") granted CyrusOne the necessary permits to construct the CyrusOne tower. Shortly thereafter, defendant Scientel Solutions LLC ("Scientel") applied to the City to construct a telecommunications tower in the same vicinity as the CyrusOne tower. The City eventually granted Scientel's application. CyrusOne opposes construction of the Scientel tower and seeks to enjoin defendant Scientel from constructing the tower.

Plaintiff has filed a motion for preliminary injunction as well as motions to exclude the testimony of defendant Scientel's proposed experts, Scott Snopek and Michael Cataletto. The Court held a preliminary injunction hearing[1] over the course of three days. Snopek did not testify during the hearing, and Cataletto did not offer expert testimony. Accordingly, plaintiff's motions to exclude are denied as moot.

Following the hearing, the Court asked the parties to submit proposed findings of fact and conclusions of law. For purposes of this opinion only, the Court adopts portions of the parties' proposed findings of fact and conclusions of law to the extent that they are supported by the record.

## A.     Parties

CyrusOne is a Delaware limited liability company. Its sole members are citizens of Texas and Maryland. The City is a municipal corporation and a home-rule unit of local government. Scientel is a Delaware limited liability company. Its sole members are citizens of Illinois.

## B.     Witnesses

Plaintiff called Jose Crespi (Vice President of Products at CyrusOne) and James Martin Snyder ("Marty Snyder") (President and General Manager of Communication Infrastructure Corporation). The Court allowed Snyder to testify as an expert in wireless telecommunications.

The City called Stephane Phifer (Director of Planning and Zoning[2] for the City of Aurora) and Juan Vasquez (Senior Construction Manager for CyrusOne[3]). The City and CyrusOne jointly

---

[1] The parties only addressed Counts III and IV of plaintiff's first amended complaint during the preliminary injunction hearing. In conjunction with this opinion, the Court has issued an opinion granting defendants' motion to dismiss Count III of the first amended complaint. As such, the Court will only address the likelihood of the merits as it pertains to Count IV.
[2] Phifer held this position during the relevant time period.
[3] Vasquez held this position during the relevant time period.

submitted a declaration from Craig Weick (Executive Director, Co-Location Product Management for CME Group).

Scientel called Richard Williams (a lawyer for Scientel Solutions), Nelson Santos (President and Member of Scientel Solutions), and Michael Cataletto (Vice President of Engineering at Scientel Solutions). Cataletto offered opinion testimony regarding his involvement in the zoning proceedings.

## C.    The CyrusOne Data Center and the CyrusOne Tower

The CyrusOne Data Center is located in Aurora, Illinois. It hosts wireless network access for its customers, including the CME. The CME is a high-volume futures exchange that is also located in Aurora, Illinois. At some point, the CME approached CyrusOne about constructing a tower, and CyrusOne made plans to construct a 350-foot telecommunications tower that would provide access to trading networks utilized by the CME.

On September 8, 2016, CyrusOne submitted a Land Use Petition to the City's Planning and Zoning Division.

On March 14, 2017, the City passed Ordinance No. 017-012, granting CyrusOne a special-use permit to construct a telecommunications facility.

On June 27, 2018, construction of the CyrusOne Tower was completed. Most of the CyrusOne tower's important destination are to the east. CyrusOne has allocated eight positions on the CyrusOne Tower to the CME Group, five of which are designated for placement at heights between 79 and 344 feet and generally point east to southeast.

**D.      Scientel and the Scientel Tower**

Scientel is a universal systems integrator.  It brings together multiple technologies for its customers, the majority of which involve public safety or municipalities.  For public-safety customers, Scientel connects a municipality's assets into a single network called a "smart city."

In March of 2016, Scientel purchased approximately 2.7 acres of property in Aurora, where it plans to re-locate its corporate headquarters, construct a network operations center, and construct the Scientel tower.  Scientel will have an immediate need for 28 antennae, followed by 14 additional antennae.

On June 7, 2017, Scientel submitted a Land Use Petition to the City's Planning and Zoning Division.  Scientel requested an ordinance granting it a special use permit and setback reduction variation for the construction of the Scientel Tower.  In relevant part, Scientel requested a special-use permit authorizing construction of a 195' telecommunications tower.

On September 20, 2017, the City's Planning Commission held a public hearing on Scientel's Land Use Petition.  Following the hearing, the Planning Commission recommended approval of Scientel's application, and referred the matter to the City Council.  On September 28, 2017, the City Council's Planning and Development Committee recommended approval of the Scientel Land Use Petition to the Committee of the Whole.  The City Council's Committee of the Whole then considered the Scientel Land Use Petition and referred it to the full City Council.  On November 14, 2017, the City Council moved to approve the Scientel Land Use Petition, but the motion failed by a vote of 7 to 3.  On November 28, 2017, the City Council voted to reconsider its decision on the Scientel Land Use Petition.  On January 9, 2018, the City Council granted Scientel's application.

### E. Zoning Proceedings Related to Scientel's Application

#### 1. Planning Commission Procedures

##### a. Stephane Phifer

Stephane Phifer was the Director of Planning and Zoning for the City of Aurora during the relevant time period. Phifer testified to the procedures followed by the City of Aurora in processing zoning applications. Phifer testified that an application first goes through various levels of staff review at the City. It is then referred to the Planning Commission for public hearing. The Planning Commission is a volunteer body that reviews applications and makes findings and recommendations to the City Council. During the public hearing process, City staff provides an overview, a petitioner presents its case, and then members of the public are given an opportunity to give testimony and ask questions. People in the audience may ask questions, City staff takes notes, and the Commission Chairperson asks "the petitioner or staff, depending on which is appropriate, to respond to each of those questions in turn." (Tr. of Proc., at p. 204.) Objectors may only object to a special use permit during the planning commission hearing. The Chairman of the Planning Commission does not typically enforce any time limits on questions from objectors.

Following the public's input, the hearing is closed. City staff gives a recommendation and then the Commission will "complete a finding of fact." The finding of fact is then forwarded to the City Council with a recommendation to approve or deny the application. The Scientel Land Use Petition followed these procedures.

#### 2. 9/20/17 – Planning Commission Hearing

On September 20, 2017, the City's Planning Commission held a public hearing on Scientel's Land Use Petition. Representatives from both CyrusOne and Scientel spoke at the

meeting.  CyrusOne's representatives did not ask that the Planning Commission members pose specific questions to Scientel at the public hearing, and CyrusOne did not request to cross-examine any Scientel witnesses.  CyrusOne sought a 90-day extension in order to review documentation related to Scientel's Application.  The Planning Commission denied CyrusOne's request.  The Planning Commission recommended approval of the Scientel Land Use Petition and entered specific findings of fact.

After hearing, CyrusOne submitted objections and written interrogatories to the City for Scientel to answer.  Scientel answered the interrogatories at the City's request.

### 3.    9/28/17 – City Council Proceedings

On September 28, 2017, the City Council's Planning and Development Committee recommended approval of the Scientel Land Use Petition to the Committee of the Whole, which considered it and referred it to the full City Council as unfinished business.  The City Council tabled the measure for a period of two weeks.  During this time, CyrusOne began lobbying City aldermen in an effort to defeat the petition.

### 4.    11/14/17 – City Council Meeting

CyrusOne's efforts initially proved successful:  the City Council's motion to approve the Scientel Land Use Petition failed at the November 14, 2017 City Council meeting. However, because the Planning and Development Committee had recommended approval of the Scientel Land Use Petition, the City Council only had positive findings of fact before it.  The City therefore did not provide a written basis for a denial as required by Section 332(c)(7)(B)(iii) of the Federal Telecommunications Act of 1996.

### 5. 11/28/17 – City Council's Reconsideration

Two weeks later, on November 28, 2017, the City Council voted to reconsider Scientel's application. Section 2-105(c) of the City's Rules of Procedures states that "[n]o motion to reconsider the acceptance/approval or rejection/denial of the recommendation of an advisory body required to hold public hearings shall be entertained except at the same meeting at which the original action was taken." (Dkt. 28-4, at p. 2.) Section 2-96 provides that the rules "may be suspended by a vote of two-thirds of the members of the council then holding office." (Dkt. 28-4, at p. 2.) Pursuant to Section 2-96, the City Council passed a motion to suspend Section 2-105(c) pertaining to the timing of motions to reconsider. The City Council then voted to reconsider its decision on the Scientel Land Use Petition. The motion to reconsider passed by the required two-thirds vote. CyrusOne did not take advantage of the opportunity to speak during the meeting.

### 6. 1/9/18 – City Council Meeting

On January 9, 2018, the City Council again considered the Scientel Land Use Petition. Phifer spoke on behalf of City staff and addressed questions from the aldermen. A Scientel representative spoke and presented a supporting PowerPoint that contained new information. Individual aldermen asked specific questions about Scientel, its business, and its proposed move to Aurora. Ultimately, the City Council granted Scientel's Land Use Petition (Nos. 17-00519, -00520, and -00521). In accordance with this action, the City adopted two ordinances, Nos. 018-001 and -002. Ordinance No. 18-002 approved the special-use for a telecommunications tower, with an adjacent lot-line setback of "no less than seventy-five (75) feet."

**F.      Construction of the Scientel Tower and the Potential for Interference**

**1.      Marty Snyder**

At the preliminary injunction hearing, Snyder testified as an expert for CyrusOne. He is the President and General Manager of Communication Infrastructure Corporation ("CIC"), which develops microwave networks, including engineering, planning, path analysis, microwave frequency coordination, construction, occasional land use planning, and installation. CyrusOne retained CIC several years ago to help plan and understand issues involved with building a wireless tower.

During the preliminary injunction hearing, Snyder discussed two potential forms of interference: (1) radio frequency interference, and (2) physical, or line-of-sight, interference.

*Radio Frequency Interference*

Snyder testified that the CyrusOne tower is a co-location tower meant to serve the needs of other tenants, with the goal of creating fair access to the CME. He testified that the Federal Communications Commission ("FCC") manages all radio spectrum in the United States and that microwave frequencies are licensed on a "first-come, first served basis." (Tr. of Proc., at p. 100.) Snyder said that CME customers typically use the "common carrier" bands, which includes 6, 11, 18, and 23 gigahertz. Snyder also said that tenants on the CyrusOne tower may also consider using "millimeter wave" or "E-band", which include frequencies of 70 and 80 gigahertz. Snyder testified that the most common and important destinations for the CyrusOne tower are located to the east of the CyrusOne tower.

Prior to the construction of the CyrusOne tower, Snyder commissioned a feasibility study from Comsearch, which is a company that evaluates whether a proposed frequency license will cause interference. For the study, Snyder gave Comsearch a hypothetical path from the CyrusOne

tower to a popular destination, a tower identified as ATC272619.  In October of 2017, Comsearch used these hypotheticals and analyzed frequencies within the common carrier band (6, 11, 18, and 23 gigahertz).  Comsearch did not analyze the frequencies within the millimeter wave or the E-band frequencies (70 and 80 gigahertz).  The results showed 3,596 cases of interference.  These reported cases of interference did not involve Scientel or the Scientel tower.

Based on the Comsearch study, Snyder concluded that construction of the Scientel tower could compound the potential for signal interference.  He testified, "from that study, what you call the feasibility study, we infer that we will be creating more problems by building a Scientel tower." (Tran. of Proc., at p. 164.)  Snyder admitted that Comsearch did not make a specific determination about the impact of the Scientel tower.  Rather, CIC and Snyder's conclusion was based on an inference.

Snyder concluded that the Scientel tower, if constructed, would potentially cause frequency interference with the CyrusOne Tower.  His opinion is limited to common carrier frequencies involving 6, 11, 18 or 23 gigahertz.  It does not involve millimeter wave or E-band frequencies of 70 and 80 gigahertz.

*Physical, or Line-of-Sight, Interference*

Snyder also concluded that construction of the Scientel tower creates the potential for physical, or line-of-sight, interference of microwave signals being transmitted to and from the CyrusOne tower from various points to the east.  Snyder testified that microwave frequencies can be interrupted if they are physically blocked.  He said that microwave beams are very large and that an obstruction off to the side a little bit could interfere with a microwave beam.  He also stated that beams and waves generally "have a tendency to go around things."  (Tr. of Proc., at p. 148.)

Snyder testified that the generally accepted standard to determine line-of-sight interference for microwave transmissions is to perform a Fresnel Zone calculation. "The Fresnel Zone represents that beam that is critical to the transmission of the signal . . . what we care about is a certain portion of the Fresnel Zone, which is called the first Fresnel Zone . . . as a microwave engineering company, our job is to identify obstructions at every microwave link that we do." (*Id*. at 93.) The size of the first Fresnel Zone varies and depends on many factors, including frequency being transmitted, the type and size of antenna, and the distance between the transmitting point and the endpoint. The range of the first Fresnel Zone "…could be 17 meters. It could be three meters." (*Id*. at 95.) There is a certain amount of degradation in a microwave transmission; the generally accepted level of obstruction within the first Fresnel Zone is 40 percent. Snyder testified that his company, CIC, performs Fresnel Zone calculations to evaluate various obstructions, determine diffraction loss, and assess the availability of a microwave link.

To perform a Fresnel Zone calculation, CIC uses a software program called Pathloss, which is the industry standard. Pathloss allows a user to input certain parameters (*e.g.*, transmitting and receiving coordinates, radio type, antenna size, power level) to develop a Fresnel Zone calculation. CIC employees, Jose Ruiz and Michael Buffington, are both certified in Pathloss. Snyder is not.

Prior to the construction of the CyrusOne Tower, CyrusOne asked Snyder to perform specific path calculations to determine the potential impact of a Commonwealth Edison substation (the "ComEd substation"), which is located to the east of the proposed Scientel tower. Snyder used Pathloss to determine the path calculations for CyrusOne and the ComEd substation. He first looked at popular known first-out towers (the first point of connection, or the first tower, in a series of microwave links) from the CyrusOne site. He then selected about six separate first-out towers and made hypothetical assumptions, including the height of the CyrusOne tower, the height of the

antenna placed on the CyrusOne tower, radio type, and antenna type. The Pathloss calculations showed no impact from the ComEd substation.

As for the proposed Scientel tower, no one at CIC performed a Fresnel Zone calculation to evaluate the impact of the proposed Scientel tower. Snyder testified that he could have made hypothetical assumptions and obtained Fresnel Zone calculations about the Scientel tower but did not do so, due mostly in part to the amount of time Snyder had to complete the RF Analysis for the City in October of 2017.

Rather than creating a Fresnel Zone calculation, CIC employee Jose Ruiz created a Google Map image[4] and drew roughly 30 lines, representing hypothetical pathways at common carrier microwave frequencies (6, 11, 18, and 23 gigahertz), emanating from the CyrusOne tower to destinations in the east.

Snyder testified that he "eyeballed" the Google Earth image created by Ruiz and concluded that approximately 12 of the approximately 30 pathways "could be blocked access to the CyrusOne tower." (Tr. of Proc., at p. 139.) Snyder stated, "I think it's self-evident. It's just an opinion, just looking at the diagrams that we've done, that there is some degree of physical blocking." (*Id*. at 99, 148.) Snyder does not identify the 12 blocked paths, and he does not identify any tower that would connect a customer license to the CyrusOne tower. Snyder concluded that the proposed Scientel tower creates the potential for physical, or line-of-sight, interference of microwave signals being transmitted to and from the CyrusOne tower from various points to the east.

### 2. Michael Cataletto

Cataletto is the Vice President of Engineering at Scientel. He oversees the engineering staff and engineering designs at Scientel. His responsibilities generally include filing applications,

---

[4] In the RF Analysis, the Google Earth image is referred to as "Image No. 1."

registrations, and licenses with the FCC. For the proposed Scientel tower, Cataletto's responsibilities include selecting the antenna and frequency.

At the preliminary injunction hearing, Cataletto testified that Scientel has not filed any applications to license common carrier frequencies (6, 11, 18, or 23 gigahertz) on the Scientel tower and that Scientel does not have plans to do so. He testified that Scientel intends to use frequencies in the bands of unlicensed 5, 10, and 80 gigahertz. To date, Scientel only has obtained frequency registrations on the Scientel tower site at 80 gigahertz. Cataletto further testified that Scientel did not and could not run a Pathloss calculation for any of the licenses Snyder said were blocked because the endpoint locations, antenna center lines, or first-out towers were never identified.

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy that should only be granted when "the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005). It is "often seen as a way to maintain the status quo until merits issues can be resolved at trial." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 783 (7th Cir. 2011). "To obtain a preliminary injunction, the moving party must show that (1) he will suffer irreparable harm before the final resolution of his claims; (2) available remedies at law are inadequate; and (3) he has a likelihood of success on the merits. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-24 (7th Cir. 2015); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). If the moving party makes this showing, the court then "weighs the competing harms to the parties if an injunction is granted or denied and considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). The court employs a "sliding-scale

analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.*

## ANALYSIS

**Irreparable Injury**

Irreparable harm is defined as harm that "cannot be prevented or fully rectified by the final judgment after trial." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008) (*quoting Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). While a party is not required to show that the harm actually occurs or is certain to occur, the party must show more than a mere possibility of harm. *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1039 (S.D. Ind. Aug. 3, 2018) (citing *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F. 3d 1034, 1045 (7th Cir. 2017)). "[S]peculative injuries do not justify" the "extraordinary remedy" of a preliminary injunction. *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005).

CyrusOne contends that an injunction is necessary because there is more than a mere possibility that the Scientel tower will be constructed before the Court rules on the merits. CyrusOne says that construction of the Scientel tower will impair its ability to provide wireless network access, including line-of-sight interference, frequency interference, frequency congestion, and "spectrum squatting." CyrusOne says that this will result in a loss of revenue and reputational damage.

Scientel responds that CyrusOne has not met its burden and that the opinions expressed by CyrusOne's expert, Marty Snyder, do not survive the relevance and reliability standards of Federal

Rule of Evidence 702. The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b)  the testimony is based on sufficient facts or data;
> >
> > (c)  the testimony is the product of reliable principles and methods; and
> >
> > (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court must act as a "gatekeeper" to "ensure the reliability and relevancy of expert testimony." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006) quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "To do so, the district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (citations omitted). An expert's testimony cannot be based on subjective belief or speculation. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Rule 702 requires the expert to "explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Id*. (citations omitted).

Defendants do not challenge Snyder's qualifications. Instead, they challenge the relevance and adequacy of his opinions as well as the reliability of his methodology.

*Radio Frequency Interference*

Scientel argues that CyrusOne has not met its burden as it relates to radio frequency interference. The Court agrees. Snyder testified that construction of the Scientel tower could potentially cause radio frequency interference. His opinion, however, depends on Scientel or its customers using common carrier frequency bands of 6, 11, 18, or 23 gigahertz. The evidence presented during the preliminary injunction hearing shows that Scientel has no plans to use common carrier frequencies. Instead, Scientel plans to use frequencies in the bands of 5, 10, and 80 gigahertz. Moreover, Snyder's opinion is speculative. He concluded that construction of the Scientel tower would potentially cause radio frequency interference. *Metavante Corp.*, 619 F.3d at 761 (expert's testimony cannot be based on subjective belief or speculation). Based on this evidence, and without any evidence showing radio frequency interference at 5, 10, or 80 gigahertz, the Court finds that CyrusOne has failed to show that it will suffer irreparable harm as it relates to radio frequency interference.

*Physical, or Line-of-Sight, Interference*

CyrusOne has also failed to show that it will suffer irreparable injury due to physical, or line-of-sight, or interference. Snyder's methodology is not well-grounded in the facts, and his opinion is subjective and speculative. Although Snyder was qualified as an expert, even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*.'" *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999)). "*Daubert* sets forth the following non-exhaustive factors for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested;

(2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community." *Bielskis*, 663 F.3d at 894. (citations omitted).

Snyder testified that the Scientel tower, if constructed, creates the potential for physical, or line-of-sight, interference. Snyder's opinion is not based on a Pathloss Fresnel Zone calculation— a calculation that his company, CIC, regularly conducts; a calculation that CIC conducted for CyrusOne prior to the construction of the CyrusOne tower; and, a calculation that Snyder acknowledged is the industry standard. Instead, Snyder's opinion is based on a Google Earth image created by one of his colleagues. The Google Earth image has 30 hypothetical lines—lines with no endpoints and, according to Cataletto, lines that cannot be duplicated or validated. Snyder "eyeballed" the Google Earth image and determined that 12 unidentified pathways could be blocked. After "eyeballing" the image, Snyder testified that it was "self-evident" that there is some degree of physical blocking. While an expert's testimony is not unreliable simply because it is founded on experience rather than data, the expert must explain the methodologies and principles that support his opinion. *Metavante*, 619 F.3d at 761. "[H]e cannot simply assert a bottom line." *Id*. Snyder does just that. He says that there is some degree of physical blocking, but he does not identify any scientifically or objectively reliable methodology, facts, or data to support his opinion. Likewise, his opinion is not based on the industry standard or a practice that his company regularly conducts. Instead, his methodology is based on his own subjective beliefs. *Metavante*, 619 F.3d at 761 (may not be based on subjective belief or speculation).

Accordingly, the Court will not consider Snyder's opinion as it relates to physical, or line-of-sight, interference. Without this evidence, CyrusOne is not likely to establish irreparable injury due to the claimed injury of physical interference to microwave signals.

**Inadequate Remedy of Law**

As for the question of adequate remedy of law, it "inevitably overlaps" with the irreparable injury analysis. *Shure, Inc. v. ClearOne, Inc.*, No. 17 C 3078, 2018 WL 1371170, at *16 (N.D. Ill. Mar. 16, 2018). CyrusOne says that the harm caused by construction of the Scientel tower cannot be accurately calculated, that no amount of money can compensate a blocked signal, and that it will suffer reputational damage. Defendants respond that CyrusOne's alleged damages are quantifiable because Jose Crespi testified during the preliminary injunction hearing that CyrusOne would lose approximately $1.7 million per year if it was unable to lease space on its tower below 200 feet.

The Court finds that CyrusOne has not satisfied this requirement. During the hearing, Crespi described CyrusOne as a landlord and estimated that the annual value of lost leases below 200 feet would be $1.7 million per year. These admissions are quantifiable. *See Alpha School Bus Co., Inc. v. Wagner*, No. 03 C 5009, 2004 WL 42299, at *6 (N.D. Ill. Jan. 6, 2004) (citing testimony of lost gross revenue and approximate profit margin to conclude that plaintiff provided direct evidence of damages). As for reputational damage, Craig Weick, the Executive Director, Co-Location Product Management for CME Group, generally stated that some customers are concerned with connecting with other data centers to the east. (Weick Dec., ¶ 12.) This, alone, is not enough to show any alleged reputational damage.

**Likelihood of Success on the Merits**

CyrusOne must also show that it has a likelihood of success on the merits. *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). "The threshold for establishing likelihood of success in relatively low." *Left Field Media LLC v. City of Chicago*, 137 F. Supp. 3d 1127, 1133 (N.D. Ill. Oct. 5, 2015). It "requires more than a 'mere possibility of relief' and more than a 'better than

negligible' showing." *Truth Foundation Ministries, NFP v. Village of Romeoville*, --- F. Supp. 3d ---, 2016 WL 757982, at \*8 (N.D. Ill. Feb. 26, 2016).

### Count IV – Due Process Violation

CyrusOne alleges several due process violations, including (1) the City's November 28, 2017 decision to reconsider the initial denial of the Scientel Land Use Petition; (2) the Planning Commission's alleged refusal to allow cross-examination at the September 20, 2017 public hearing; (3) the City Council's alleged refusal to allow CyrusOne representative to cross-examine witnesses at the January 9, 2018 meeting; and (4) the City Council's alleged consideration of new evidence at the January 9th meeting. "Procedural due process is founded upon the notion that prior to a deprivation of life, liberty or property, a party is entitled to 'notice and opportunity for [a] hearing appropriate to the nature of the case.'" *Passalino v. City of Zion*, 928 N.E.2d 814, 818 (Ill. 2010) (quoting *Jones v. Flowers*, 547 U.S. 220, 223 (2006), quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "[D]ue process is a flexible concept, and the specific procedural requirements vary, depending upon the nature of the rights affected and the context in which the deprivation occurs." *Peacock v. Bd. of Trs. of Police Pension Fund*, 918 N.E.2d 243, 251 (Ill. App. Ct. 2009). A special-use petition shall be subject to judicial review "as a legislative decision." 65 ILCS 5/11-13-25(a).

Even assuming that CyrusOne had some procedural due process rights as an interested party, it has not established a likelihood of success on this claim.

#### *Motion to Reconsider*

CyrusOne contends that the City Council's November 14th decision constituted a final order and the grant of the Scientel application was therefore void. On November 28, 2017, the City Council voted to reconsider the denial of the Scientel application. The City's Rules of

Procedure are found in Sections 2-96 through 2-109 of the Aurora City Code, and these rules govern the manner in which the City Council conducts its business. Section 2-105(c) provides that a motion to reconsider a vote when there has been a recommendation by an advisory body should be entertained "at the same meeting at which the original action was taken." (Doc. 28-4, at p. 6.) Section 2-96 provides that the Rules "may be suspended by a vote of two-thirds of the members of the council then holding office." (Doc. 28-4, at p. 2.) At the November 28, 2017 meeting, the City Council unanimously voted pursuant to Section 2-96 to suspend Section 2-105(a) pertaining to the time of motions to reconsider.

CyrusOne says that the City cannot reverse final orders without limitation. The cases cited by CyrusOne, however, are not compelling. For example, CyrusOne cites *Ceresa v. City of Peru*, 273 N.E.2d 407 (Ill. App. Ct. 1971), for the proposition that reconsideration of a petition was improper under similar circumstances. However, the circumstances in *Ceresa* are quite different from the circumstances here. As noted by defendants, the City of Peru followed Robert's Rules, and the City is a home-rule unit. Moreover, in *Ceresa*, the City Council denied a request to rezone certain property from residential to commercial. *Id*. at 750. At the next City Council meeting, the owner presented the City Council with a motion to reconsider the zoning board of appeal's recommendation. *Id*. This request was granted, and the matter was then tabled for the next thirteen regular meetings. *Id*. Here, the City made a motion to suspend its rules so as to comply with federal telecommunications laws[5]. Phifer testified that the Planning Commission had favorably recommended the Scientel proposal to the City Council. Because of this favorable recommendation, only the Planning Commission's positive findings of fact were before the City

---

[5] Section 332(c)(7)(B)(iii) of the TCA provides that any decision by a local government to deny a request to place, construct, or modify personal wireless service facilities must be in writing and supported by substantial evidence contained in a written record. 47 U.S.C. §332(c)(7)(B)(iii).

Council.  So, it was problematic when the motion to approve failed because "at that time, the only findings of fact in front of the City Council were the positive ones."  (Tr. of Proc., at p. 237.)

CyrusOne also cites *City of Chi. Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 749 N.E.2d 916, 931 (Ill. 2001) for the proposition that a municipal legislative body may not arbitrarily ignore certain mandatory procedural prerequisites before amending a zoning ordinance.  *Living Word* is likewise distinguishable from the case at bar.  In *Living Word*, the city council denied Living Word's application for a special use permit for a noncommercial use: a church.  *Id*. at 920.  The city council justified the denial, stating that the city had a comprehensive plan to develop the area as a commercial corridor and that the church, as a noncommercial use, would be at odds with the goals of the comprehensive plan.  *Id*.  The city said that it was not treating Living Word differently because it planned to deny all applications for special use permits that were noncommercial.  *Id*. at 930.  The Illinois supreme court determined that the city's rationale effectively acted as an amendment of the city's zoning ordinance—it created a new zoning district that was exclusively commercial.  *Id*.  The court was disinclined to allow such a *de facto* amendment of the city's zoning ordinance.  *Id*.  The court found that certain mandatory procedures regarding notice and hearing had to be followed before the zoning ordinance could be amended.  *Id*.  The court stated that the city may not arbitrarily ignore the procedural prerequisites before amending the city's zoning ordinance.  *Id*. at 931.

Here, CyrusOne is challenging the City's suspension of its procedural rules in relation to a specific incident:  the motion to reconsider.  As noted, the City suspended its rules so as to avoid violating federal telecommunication laws. This does not appear to be an arbitrary action, but, rather, appears reasonable given the circumstances.  In terms of any due process violations, CyrusOne representatives were present at all meetings and hearings related to the Scientel zoning

proceedings and were not denied an opportunity to be heard. Given this, the Court does not find that CyrusOne has likelihood of success on this theory.

### *Opportunity to Cross-Examine and Otherwise Test Newly Presented Evidence*

Likewise, CyrusOne is unlikely to show that the City deprived CyrusOne of any state constitutional due process rights. CyrusOne is essentially arguing that zoning proceedings before the Aurora Planning Commission and Aurora City Council are similar to "mini-trials" and that the local legislature and the body advising that legislature must allow opponents of a petitioner to cross-examine the petitioner.

In making these arguments, CyrusOne primarily relies on *E & E Hauling, Inc., v. DuPage Cty.*, 396 N.E.2d 1260 (Ill. App. Ct. 1979), where the court found that that procedures at zoning board hearings must include the right to relevant cross-examination. *Id*. at 1264. At the time *E&E Hauling* was decided, zoning board hearings were deemed administrative or quasi-judicial in nature. *Id*. Defendants correctly note, however, that this holding is outdated and that the legal landscape of zoning board hearings has changed. In *People ex rel. Klaeren v. Vill. of Lisle*, 781 N.E.2d 223 (Ill. 2002), the Illinois supreme court declined to adopt *E & E Hauling*'s blanket determination that "a public hearing before any tribunal or body includes the full panoply of due process rights." *Id*. at 233 (internal quotations omitted). The *Klaeren* court noted that there is a distinction between legislative hearings and administrative hearings before municipal bodies. *Id*. The court ultimately held that zoning hearings addressing special use applications were administrative or quasi-judicial in nature and that it would therefore be a denial of due process if interested parties were not afforded the opportunity to cross-examine an adverse witness. *Id*. at 234-235.

In response to *Klaeren*, the legislature amended Section 11-13-25 of the Municipal Code, classifying every zoning decision as a legislative act that is subject to *de novo* review. *Condo. Ass'n of Commonwealth Plaza v. City of Chi.*, 924 N.E.2d 596, 609 (Ill. App. Ct. 2010); *see also* 65 ILCS 5/11-13-25(a). Illinois courts have interpreted the amendment as an attempt to nullify *Klaeren*'s holding that a municipality was acting in an administrative or quasi-judicial capacity rather than a legislative capacity when ruling on a special use permit application. *See Condo. Ass'n of Commonwealth Place*, 924 N.E.2d at 609; *Dunlap*, 915 N.E.2d 890, 899 (Ill. App. Ct. 2009); *Millennium Maint. Mgmt., Inc. v. Cty. of Lake*, 894 N.E.2d 845, 856 (Ill. App. Ct. 2008) ("the General Assembly notes that quasi-judicial proceedings are to be reviewed on the record, which, in turn, requires such proceedings to be conducted in the manner of a mini-trial. Given their essentially legislative character, the corporate authorities of municipalities and counties are not well-suited to conduct mini-trials.") (quoting legislative record).

The crux of CyrusOne's claim is based on *E&E Hauling*, which is outdated. Zoning proceedings are no longer considered "mini-trials" or administrative in nature where judicial review is limited to an existing record. Instead, zoning proceedings are considered legislative and are subject to *de novo* judicial review where new evidence may be presented before the trial court. *See Conaghan v. City of Harvard*, 60 N.E.3d 987, 999 (Ill. App. Ct. 2016). CyrusOne has provided the Court with no compelling authority showing that it was entitled to traditional forms of cross examination at the zoning proceedings. It likewise has not shown that it was not given an adequate opportunity to be heard. In fact, the City afforded CyrusOne with opportunities to present its objections to the Scientel land petition. Moreover, CyrusOne submitted additional evidence to the City Council after the Planning Commission public hearing concluded, including legal analysis and direct contacts with alderman. These actions undermine CyrusOne's arguments that it did not

have an adequate opportunity to be heard. For these reasons, the Court finds that CyrusOne is not likely to succeed on this theory.

A review of the preliminary injunction proceedings reveals that the City acted reasonably during the zoning proceedings and gave CyrusOne, as an interested party, notice and an opportunity to be heard. Accordingly, the Court finds that CyrusOne does not have a likelihood of success on this claim.

In sum, the Court finds that CyrusOne has failed to establish the prerequisites for granting a preliminary injunction. Because CyrusOne has failed to satisfy its burden, the motion for preliminary injunction is denied.

## CONCLUSION

For the reasons discussed above, CyrusOne's motions to exclude expert testimony are denied as moot, and its motion for preliminary injunction is denied.

Date: 3/11/2019

_____
Jorge L. Alonso
United States District Judge